## George Harris *v.* The State.

1. CONTINUANCE. — A possibility that at some indefinite future time a fugitive witness may be secured, or his locality be ascertained, so that his testimony may be procured by deposition, does not entitle a defendant to a third continuance. In criminal as well as civil cases there must be an end to litigation, and a trial should not be repeatedly postponed upon such vague hypotheses.

2. IMPLIED MALICE. — When the fact of unlawful killing is proved, and no evidence tends to show express malice on the one hand, or any justification, excuse, or mitigation on the other, the law implies malice, and the offence is murder in the second degree. However this principle may elsewhere be questioned by courts or commentators, it has been too long and too firmly established in the jurisprudence of this State to be now impugned by judicial authority. See the opinion *in extenso* on this subject.

3. MALICE. — A clear, concise, and comprehensive definition of legal "malice," though often attempted, has not been fully achieved. Approximately, it is that condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which condition is inferred from acts done or words spoken.

4. SAME — CHARGE OF THE COURT. — The term "malice" is sufficiently expounded to a jury by a charge which, without critical refinements, substantially explains its legal in contradistinction to its ordinary signification. And if in a trial for murder the charge limits the meaning of the term to hatred, ill-will, or hostility, the error is not to the prejudice but to the advantage of the defence.

5. SELF-DEFENCE. — See in this case an instruction on the right of self-defence, which, as an entirety, was substantially correct and sufficient, and not amenable to the objection that it restricts the right to take life to those cases only in which the life of the slayer is imperilled, to the exclusion of those in which he is in danger of serious bodily injury.

6. PRACTICE. — When there was no evidence that fresh provocation intervened between preconceived malice of the defendant towards the deceased and the infliction of the mortal injury, it was not error to refuse an instruction on that subject.

7. VERDICT. — "State prison," in a verdict, sufficiently designates the penitentiary.

APPEAL from the District Court of Travis. Tried below before the Hon. E. B. TURNER.

The indictment charged the appellant with the murder of E. Olenick, December 12, 1877, by shooting him with a pistol. The trial was had in June, 1879, and resulted in a verdict convicting him of murder in the second degree, and assessing his punishment at ten years " in the State prison."

Olenick, the deceased, kept an auction-store on the north side of Pecan Street in the city of Austin, and about five o'clock in the afternoon of December 12, 1877, was shot at its front door. He was shot in the left eye, and the ball

came out about half an inch above the orifice of the right ear. His whiskers and eyebrows were singed and his face somewhat powder-burned. That the shot was fired by George Harris, the appellant, was not a controverted matter.

It was in proof for the State that, at a night auction of Olenick's, about a week before he was killed, Harris, the defendant, bid off two shirts at $2.20, and subsequently bid off six yards of cassimere at $1.25 per yard. He paid for the shirts, and, before bidding off the cassimere, inquired of Marshall, a clerk in the store, whether he could leave the cassimere until morning in case he should buy some of it, — the inference being that he would not pay for the cassimere until the next morning. Marshall told him that he could do so, and suggested that he also leave the shirts, — the motive of the suggestion being to keep the shirts as a guaranty that the cassimere would be taken and paid for, though this motive was not communicated to the defendant, Harris. Accordingly the shirts, as well as the cassimere and some trimmings also bought by Harris, were left in the auction-store.

Besides assisting at the night auctions on Pecan Street, Marshall clerked in a store on Congress Avenue, of which Olenick was a proprietor. The next day after the auction-sale to the defendant, Marshall was called out of the store on the avenue by the defendant, and a conversation ensued which Marshall narrated as follows : "I asked him what he desired. He told me that that d—d, or G—d d—d, Dutch son of a bitch wouldn't give him them shirts. I told him to wait a few minutes till I got done waiting on the lady, and I would see that he got the goods. He said he only wished the shirts that he bought and paid for. I told him that changed the face of affairs considerably. He asked me must he lose the money he paid for the shirts if he didn't take the cassimere. I asked him did he think us soft enough to let him bid and us cut off goods, and not make him take them. Defendant said he would have the money,

shirts, or blood ; said he didn't wish to have any difficulty with me. I told him there was no occasion to have any difficulty with anybody ; told him Olenick was a stranger here, — had only been here a short time. Defendant asked me how long ; I told him about two months. He asked me where Olenick was from ; I told him New York. He told me that if he did not give him the money or the shirts, there would be one Dutchman less to go back there. I made some answer, which I disremember now. Defendant left then, and went towards his buggy. I told Olenick what had occurred, on his way to dinner ; this conversation had occurred during the forenoon. He (Olenick) said they did not shoot every time they said so." This witness was not present at or near the auction-store when Olenick was killed, a few days subsequent to the conversation just related.

On cross-examination, the witness could not say that it was any injury to the cassimere to cut it off ; the injury otherwise was in time and expense. Olenick did refuse to give up the shirts or the money unless the defendant would also take and pay for the cassimere.

O. N. Hollingsworth, for the State, testified that he knew neither the defendant nor Olenick at the time the latter was killed, but happened to pass the auction-store just before the fatal shot was fired. He was walking on the pavement, and going eastwardly. As he passed the store he noticed that a man was standing in the door, and thought, but was not positive, it was the same man who was shot. Witness had passed on from five to ten steps when his attention was called by the words, in an excited tone, "Then you won't pay me my two dollars," and, looking back, immediately saw the shot, and observed the blood spurt from the face of a man standing in the door of Olenick's auction-store, who, as he afterwards ascertained, was E. Olenick. The man who fired the shot was on the pavement in front of and very close to the man who was shot. After the shooting, this man ran by witness and into a saloon adjoining Platt's

livery-stable, and from the saloon into the stable, where witness lost sight of him.

William Allen, for the State, testified that he knew both the defendant and the deceased, and saw them when the latter was shot by the defendant. Witness was sitting in the door of Weed's livery-stable, across the street from Olenick's auction-store. He saw the defendant come out of the auction-store on to the pavement, and the deceased follow him immediately and stop in the door, leaning against the door-facing. Witness heard talk pass between the deceased and the defendant, but did not understand what was said. He noticed Olenick, while in the door, put his hands in his pockets three or four times, drawing them up and pushing them back again. On his cross examination, the witness said that when Olenick got to the door he put his hand in his pocket quick, and the motion impressed him at the moment so that he said to a man he had been talking to, that Mr. Olenick was going to shoot Mr. Harris.

M. Davis, for the State, testified that he kept a store two doors west of Olenick's auction-house. About ten or twelve o'clock of the day of the homicide, Olenick was at witness's store, when Harris and one Geisenger, a constable or deputy-sheriff, came together, and the latter asked witness, " Is that Mr. Olenick?" and being told it was, he said to Olenick, " What is it about the goods?" Olenick explained to him how he regarded the matter, and the party walked to the front of Olenick's auction-house. Harris, alluding to Geisenger, said to Olenick, " Here is a man to whom I am willing to leave it; what he says will satisfy me." A customer took Olenick into the store, and witness asked Geisenger what his decision was. Geisenger said the goods should be sold over again at auction, and whatever loss there was, Harris should pay. Olenick did not hear this. Witness had known Olenick intimately since 1863, and never knew him to carry weapons. After Olenick was shot, he was taken to witness's house and undressed; no pistol was found on him. He

died the same night.　On cross-examination, the witness said that Olenick made no reply to the defendant's proposition to leave the matter to Geisenger.　Olenick was a stout man, and weighed about one hundred and seventy-five pounds.

A. Rosenbaum, for the State, testified that he was a clerk for Davis, the preceding witness.　On the 7th or 8th of December, 1877, he saw Olenick, Charles Raymond, and the defendant together on the pavement.　Olenick beckoned to witness to come to his store, and then walked into it, followed by the defendant and Raymond, and after them the witness went in.　Olenick said to witness, " Stay here ; these men want to take possession of my store ; " he said they were going to go behind the counter.　Harris and Raymond were then standing at the show-case, and Olenick took a seat in front of it.　Defendant said, " What are you going to do about it?" and then Olenick said, " When you pay for the cloth and shirts you can have your goods." Raymond said, " Let us go up to Mr. Marshall, George," and some loud talk followed.　Defendant told Olenick he would kick him if he would come out into the back yard. Olenick replied, " I am not such a fool as to go out into the back yard with a rowdy."　Raymond said, " Let us go, George," and made for the door, and both held up their hands and said, " If you don't give me back my shirts, when I catch you out in the country I'll cut it out of you." They then got in their buggy and drove off towards Congress Avenue.　Late in the evening of the 12th of the same month, Harris looked in at Davis's store, and then walked towards Olenick's.　Witness heard the shot, and having heard Harris's threats on the previous day, ran towards Olenick's store, and there saw Olenick bleeding and staggering in the door, and a man running away.　On cross-examination, the witness stated that Olenick told Harris and Raymond to leave his store, on the occasion witness had spoken of.

There were other witnesses examined for the State, but

they disclosed no additional facts of a material character. Those who spoke of Olenick's attitude, when shot, placed him in the doorway of his store, and leaning either against the door-facing or on a trunk upon a box which stood just out of the door and by the west side of it.

For the defence, Reese Erwin testified that he was working in a saddle-store which stood next to and on the east side of Olenick's auction-house, and heard the shot by which Olenick was killed.    As he got to the door he saw a man pass east with a pistol in his hand.    He then looked at Olenick, and went to him.    A fellow called Jake was then exclaiming, " What shall I do ! "    About that time J. Jacobs came, and either he or Jake assisted witness in laying Olenick down.    Some one said to get a blanket to put under his head, and by the time the blanket was brought the witness and others had unbuttoned his vest, and as his vest fell back a pistol came in full view.    Witness could not say whether it had been in a pocket or not.    It was an old style Smith & Wesson five-shooter, and was on the half-cock.    Witness did not know what became of the pistol.    Quite a number of persons were present when the pistol came in view, but witness remembered no other names than the two he had mentioned.

A. T. Erwin saw Olenick's body after he was shot, and saw a pistol on his clothes.    It was either a five or a six-shooter ; whether cocked or not, the witness could not say.

E. D. Rousseau saw Olenick, about a month before he was killed, draw a pistol in his store on a man named Oscar Woods.

J. Fowler, for the defence, testified that just before the shot was fired he saw the defendant come out of the store quick, followed by Olenick in a rush.    Witness thought Olenick put one foot on the pavement, and seemed excited and mad.    Olenick and the defendant said something, but witness did not understand what was said by either.    Just then Olenick shoved his right hand into his right pocket,

and the defendant drew a pistol and shot him. Defendant went nearly across the sidewalk before he turned and faced Olenick, and then there was only time for a remark, a reply, and the shot. When Olenick shoved his hand in his pocket, witness, supposing he would shoot, looked at the defendant, expecting to see him shot. Witness was eight or ten steps distant, leaning against an awning-post.

E. W. Cullen, for the defence, stated that he was in Olenick's auction-store a few moments before the shot. Olenick seemed to be in a desperate or angry mood. Being asked his name by witness, he first refused to give it, and then told it gruffly.

J. Kuntz, for the defence, testified that he was at the auction-sale with Harris. He heard the terms of sale proclaimed; they were, " Buy, and if you don't like don't take."

Charles Raymond, for the defence, testified that he went in a buggy with the defendant, at the latter's request, to Olenick's auction-store. Defendant got out of the buggy and went into the store, leaving witness in the buggy, but afterwards called him into the store. Defendant said he had bought some shirts from Olenick the night before, and had paid for them, and that Olenick now refused to let him have them. Witness asked Olenick how it was, and he said it was none of witness's business. This was the first intimation to witness of anything wrong, and he told Olenick he would like to hear his side of the story. Olenick seemed excited and mad, and said it was none of witness's matter; and he would make no reply to witness's inquiry if the defendant had bought shirts there and paid for them. Witness asked him if the shirts were done up in a bundle and marked paid, or not; and he again said it was no business of the witness's, and ordered witness and the defendant out of the store. He was walking towards witness, and was very much excited. Witness told him he wanted no fuss or fight with him, — that he, witness, was not that sort of a

man, — and that he, Olenick, was too big a man for him
anyhow. Olenick, the witness thought, sent a little negro
to tell Mr. Davis to come there, and remarked that he had
as many friends in this town as anybody. Witness told him
that Mr. Davis, if he was a gentleman, would come in and
talk about the matter right. Then Mr. Baptist, the auc-
tioneer, came in, and while witness and the defendant were
talking to him, Olenick again ordered them out of the store.
Witness replied that they were not talking to him, and pro-
posed to the defendant to go. As they turned to leave,
Olenick, with his hand in his pocket, advanced on the de-
fendant, who said, " Don't lay hands on me," and asked,
" Would you shoot a man?" Olenick, in an excited and
sarcastic manner, replied, " Oh, no ! I would not shoot a
man." Rosenbaum (a State's witness) was not there, and
this witness positively contradicted the testimony of Rosen-
baum about the defendant inviting Olenick into the back
yard, and about any threat as to cutting him if he found
him in the country. After this interview between Olenick,
witness, and the defendant, the latter went to his sister's,
and did not come back to Austin for five or six days. About
eleven o'clock of the day of the homicide, the defendant
told witness that Olenick had sent for him. Witness asked
why he did not go, and he replied that he was afraid they
had a crowd there and wanted to whip him. Witness sug-
gested that probably Olenick wanted to give him his shirts,
and said he would go with him. They started, and on the
way met deputy-sheriff Geisenger, with whom the defendant
was acquainted, and a conversation between them ensued
until twelve o'clock struck, when witness told them he would
have to leave and go back to his work. He asked the de-
fendant when he was going home, and defendant said in a
few moments, and witness bade him good-bye. Witness
was a brother-in-law of the defendant, and had known him
for seven years, during which time he did not know the de-
fendant to carry a pistol.

Dennis Corwin, sheriff of the county, testified that Gei-senger was a deputy-sheriff when Olenick was killed. The defendant was delivered into witness's custody by the sheriff of Hill County.

The testimony just related covers comparatively but a small space in the statement of facts ; it comprises, however, the salient features of the case relied on by the prosecution and the defence. The defendant was pursued immediately after the homicide, but was not overtaken. How he came into the hands of the sheriff of Hill County, does not appear in the record. Other matters appear in the opinion of the court.

*Walton, Green & Hill,* for the appellant. 1. The dec-laration of the court that the law implies malice under a given state of facts, should have been changed, and the jury informed that they might infer implied malice if they thought, under the facts and circumstances, implied malice was present, etc. *Perry* v. *The State,* 44 Texas, 478 ; *The State* v. *Swayze,* 30 La. An. 1325 ; *Maher* v. *The People,* 10 Mich. 212 ; *The People* v. *Moody,* 45 Cal. 289 ; 2 Green's Cr. Rep. 520 ; *The State* v. *Porter,* 34 Iowa, 131 ; 1 Green's Cr. Rep. 241 ; Hor. & Thomp. on Self-Defence, 938, 939.

The ablest discussion of this question we have seen is in the dissenting opinion of Mr. Justice Wilde, in *York's Case,* 9 Metc. 93, also reported in Bennett and Heard's Leading Criminal Cases. The note by the reporters, at the end of said case, is exhaustive, and must shake, if not over-throw, the opinion of any lawyer who believes that the court has the right to charge that the law implies malice. We are not unaware that authorities against our position are eminently respectable, and sustained by age, but we believe that modern decisions are turning, if they have not already turned, the current to the safe rule, — that the court must announce the law, and the jury find the facts.

2. The charge of the court should have been further modified by withdrawing one or the other portion of the charge which defined murder in the second degree.

We take it that the court has no right to impress the jury with any particular view for or against the prisoner. The court has no right to lead the minds of jurors up to a particular view to be taken of the facts or the evidence. The court should fairly and plainly announce the law, dwelling on no special part, overlooking none that is applicable to the case, pass it to the jury, and let them fairly apply it to the facts. No man can tell what effect such a repetition, such a dwelling, such a recalling to the attention of the jury will have. It is calculated to make them believe that the court thinks that it is about at that point they should centre, or, if not centre, not to pass without a more thorough investigation and hesitancy than they need use at other points.

We submit that all the decisions guard a prisoner from such danger, — that is, from impression by the judge; and we submit further, that all such decisions, in spirit, condemn the needless repetition of a material portion of the charge.

3. The court further charged the jury as follows, in its effort to define malice: " Malice is a necessary ingredient in murder, and means hatred, ill-will, hostility towards another, a wrong and unlawful motive or purpose towards another; the wilful doing of an injurious act towards the person of another, without lawful excuse. Malice, being an emotion of the mind, cannot be seen of men or testified to by witnesses as an independent fact; its actual existence can only be ascertained by proof of facts and circumstances, such as the conduct and declarations of a party at or before the homicide, which acts or declarations lead to the conclusion that there did exist in the mind of the person killing, this thing called malice towards the party slain, at or before the homicide."

To this the appellant objected because the same does not give a clear, practical, or lawful definition of the term " malice ;" because it was calculated to and probably did confuse and mislead the minds of jurors, in that it contradicts and is directly contrary to the charges first set out ; because the term malice is defined too loosely, too broadly ; is not concise, yet full ; is not brief and clear, and is not practical and plainly intelligible to the common understanding. If a man should be guilty of manslaughter, then, under the above definition the homicide would be with malice. " Malice is  *  *  *  the wilful doing of an injurious act towards the person of another, without lawful excuse." Is not manslaughter the wilful killing? — not only the doing of an injurious thing, but a wilful killing? If not wilful, it would not be an unlawful killing without lawful excuse. It seems to us that the judge, in his anxiety to make plain to the jury what malice is, confused them, and sent them off on an entirely wrong scent. This court has defined what malice is, time and again, and why it is that the lower courts cannot be satisfied to repeat to the jury what the higher courts have said in defining malice, we do not understand, and, we suppose, never will. Wrapt in the dignity of their own originality, they decline to follow in known paths, but experiment curiously, and, as a rule, do defendants great harm that cannot be remedied short of a long imprisonment while appeal is pending. This is rather a compound definition, — a definition of many parts, each part being a whole. Some of the parts, if not connected with other parts, might be held to be right ; but when joined together they constitute a monstrosity, a centaur in modern life, a mermaid in fresh water.

The judge utters, in the sentence quoted above, the result or consequence of malice, rather than what malice is.

It will be profitable, perhaps, to review what this court, as well as the Supreme Court, have said as to what is malice, and how to convey to the jury a fair comprehension of what

it is.  In *Tooney* v. *The State*, 5 Texas Ct. App. 188, Mr.
Justice White says : "Malice aforethought, when attempted
to be defined, has been necessarily given a more compre-
hensive meaning than enmity, ill-will, or revenge, and has
been extended so as to include all those states of mind
under which the killing of a person takes place without any
cause which will in law justify, excuse, or extenuate the
homicide ; " and cites *McCoy* v. *The State*, 25 Texas, 33 ;
*Rex* v. *Harvey*, 2 Barn. & Cress. 268 ; 1 Hawk. P. C. 95 ; 1
Russ. on Cr. 482 ; Penal Code, art. 607.  Malice is not the
wilful doing of an injurious act towards the person of an-
other without lawful excuse, but it is the wilful doing of
such injurious act without any cause which will justify, ex-
cuse, or extenuate the act.  Whether the malice be express
or implied, the rule is the same : that the inculpating act
must be without cause justifying, excusing, or extenuating
it.  To wilfully kill, or do anything injurious against another,
is not necessarily with malice ; it may be in self-defence, it
may be in heat of blood, and yet nevertheless be a killing
or an injurious act.  *Cox* v. *The State*, 5 Texas Ct. App.
495, where express malice is very clearly defined, bears us
out in our objection.  The distinction we make is plain, and
all the cases where malice is sought to be defined condemn
that part of the charge of the court we are now discussing.
The court stopped short ; it failed to teach a complete lesson.

We again call the attention of the court to the peculiar
phraseology of the charge.  " Malice   *   *   *   means
hatred, ill-will, hostility,   *   *   *   a wrong and unlawful
motive   *   *   *   towards another."  The above is the
end of a sentence, and, whether right or wrong, cannot affect
what follows.  The next sentence is complete within itself,
and must stand or fall by and on its own terms.  Malice
is "the wilful doing of an injurious act towards the person
of another without lawful excuse."  Is this true, as law?
Was it intended that the jury should understand that if ap-
pellant killed Olenick, and that the killing was unlawful, it

was a killing with malice? The court tells the jury so. If that be not the law, then the jury was grievously misled. But is the other part of the definition sound in law? We cannot think so. The court tells the jury that if appellant hated or had ill-will or hostility toward deceased, and killed him, then the killing was with malice. This is not the law. In order that the killing should be with malice, it must ensue because of the hatred, ill-will, or hostility. A man may kill one whom he hates, or towards whom he has hostility. He is not necessarily a murderer because he killed his enemy. The fact of enmity must be the controlling, the moving fact, — the fact that influences the killing. We do not think this proposition can be answered by saying the jury understood the charge. Who knows what the jury understood? The court did not tell them so; on the contrary, they were told a very different thing, and in such a way as to make them believe it. We can never yield our assent to the proposition of the court. It is too loose an exposition of the law. We do not believe that other than a jury of judges, and good ones at that, could fail to be confused at the definition of malice as given.

What is malice? It is the doing of a wrongful act intentionally, without just cause or excuse in extenuation; an act committed without legal justification or excuse in extenuation; a wrongful act, intentionally committed, without cause to justify, excuse, or extenuate. 9 Metc. 104, 410; 15 Pick. 337; 4 Ga. 14; 33 Me. 331; 7 Ala. (N. S.) 728; 2 Dev. L. 425; 2 Rich. L. 179; 1 Dall. 335; 1 Den. Cr. Cas. 62; 11 Humph. 172; 6 Blackf. 299; 1 East's P. C. 371; 5 Texas Ct. App. 188; 25 Texas, 33; Barn. & Cress. 268; 1 Hawk. P. C. 95; 1 Russ. on Cr. 482; 5 Texas Ct. App. 493.

What does the court charge? The charge is that malice is the wilful doing of an injurious or wrongful act toward another without lawful excuse, leaving out the qualification which a merciful law attaches, viz., "without cause which would justify, excuse, or extenuate the act."

We leave this point, hoping that no citizen will ever lose his liberty under the effective operation of such a charge as has doomed appellant to ten long years in the penitentiary, branded as a felon.   The law is not that way, — it cannot be that way ; and we rely with the utmost confidence that this court will declare the law to be otherwise.

*George McCormick*, Attorney-General, for the State. The following propositions must be conceded : —

1. Ours is a system complete in itself.  Penal Code, art. 3.

2. We derive our definition of offences, and especially those that relate to homicide, from the common law.   See 4 Bla. Comm., marg. p. 195 *et seq.*

3. We have adopted the common law as our rule of construction.   Penal Code, art. 4.

4. The words used in the statute are to be construed according to the plain import of the words used, without reference to the distinctions usually made between the construction of penal laws and laws upon other subjects. Penal Code, art. 9.

5. The intent to commit an offence is presumed (in law) whenever the means used are such as would ordinarily result in the commission of the forbidden act.   Penal Code, art. 50.

6. On the trial of any criminal action, when the facts have been proven which constitute the offence, it devolves upon the accused to establish the facts or circumstances on which he relies to excuse or justify the prohibited act or omission.   Penal Code, art. 51.

7. A defendant in a criminal action is presumed innocent until his guilt is established by the evidence beyond reasonable doubt.

8. The State is bound to make out a case, and the burden is upon the State to make out a case.

9. When the State has by the evidence made out a case of guilt, that is all that is required at its hands, and if the evidence stops here, the defendant should be convicted ; and

unless the defendant can relieve himself by showing some fact or circumstance that exonerates or mitigates, he must be held responsible. This is what art. 51 of the Code means.

Did the judge commit error in charging that if the homicide was shown to have been unlawful, and the evidence did not disclose such circumstances as should reduce the offence to manslaughter, the law implied or imputed malice, and denominated such homicide murder in the second degree?

It must be remembered that we borrow our definition of the law of homicide, as well as most of the other crimes known to the Code, from the common law. See 4 Bla. Comm., marg. p. 195; id., marg. pp. 200, 201. This law is cited to show that the law does imply malice; and in this connection we call attention to the closing paragraph of the book above referred to, on (marg.) p. 201, and respectfully ask the same to be considered in connection with art. 51 of the present Code; and if the statute is to be followed, the common-law rule of interpretation is imperative. See art. 3 of the Penal Code.

We have seen that we have the common-law definition of murder, and that we are required to interpret those words as they were interpreted at common law; and this construction was recognized in the case of *McCoy* v. *The State*, 25 Texas, 38, and the cases there cited.

That the law implies malice, has been asserted from the Supreme bench by all the different organizations thereof, and by this court ever since its organization; and it does seem that the question should be regarded as settled. *Atkinson* v. *The State*, 20 Texas, 533; *McCoy* v. *The State*, 25 Texas, 38, 39, *et seq.*; *Anderson* v. *The State*, 31 Texas, 442; *Farrer* v. *The State*, 42 Texas, 272.

This court has again and again declared that the law implies malice. *Plasters* v. *The State*, 1 Texas Ct. App. 679; *Murray* v. *The State*, 1 Texas Ct. App. 422; in which

last case *Farrer* v. *The State* is cited as furnishing the true rule. I need not cite the numerous cases where the court has affirmed the doctrine of malice implied by the law. Suppose A. with express malice shoots at B., but by accident kills C. If the law does not furnish the malice by implication, there is none, and yet we all agree that it is murder.

Whilst there were not different degrees at the common law in murder, the punishment was inflicted by the court according to the enormity of the offence, after the jury found the defendant guilty of murder. The definition of murder is the same with us as at the common law, so far as it relates to malice; the terms being used, "express or implied." That express malice must be proven in this State, it is too late to question. It necessarily follows that malice *shown* by the evidence is express malice, or malice in fact. That which is implied is that which is involved in and grows out of the act itself, without further proof than a voluntary, unlawful, wilful act towards another, without justification or excuse.

If there could arise any doubt upon this subject, the Legislature has prescribed the way out of the difficulty. We are directed by law to follow the line of construction as taught by the common law. Penal Code, art. 4. Is this law to be respected? If so, the question is settled; as no single case of respectability can be found by reference to the English decisions, nor have I been able to find one in the American courts where the common law prevails; but what asserts the doctrine of implied malice in law.

CLARK, J. Under well-recognized and established rules, the application of defendant for a third continuance was manifestly insufficient in more than one essential particular. A continuance had already been had because of the absence of the three witnesses, after which no legal diligence was shown on the part of defendant to secure their attendance

upon trial.   Two of the witnesses are shown in the appli-
cation to be beyond the jurisdiction and process of the
court, and the whereabouts of the other is left wholly to
conjecture.   There should be an end of litigation, in crim-
inal as well as in civil matters, and trials cannot be post-
poned repeatedly upon vague hypotheses that perhaps at
some indefinite time in the future a fugitive witness may
be possibly secured, or his exact whereabouts become known
so that his testimony may be utilized by deposition.   The
court could not well have done otherwise than overrule the
application, and we perceive no error in its action.

The charge of the court is reviewed and criticised by
learned counsel for appellant in a most ingenious and elab-
orate argument, but, when considered as an entirety, we
cannot say that it failed to present in a substantial manner
all the law applicable to the case, or that the jury could have
been misled by the terms employed.   That malice arises
by implication of law from the isolated fact of unlawful
killing, so as to endow an act of homicide with the attributes
of murder in the second degree, has, of late years especially,
been seriously combated by the profession and commenta-
tors as an excrescence upon the law which should be elimi-
nated; and courts of certain States whose statutes are not
altogether similar to ours have assumed, in a measure, this
advanced position, and now hold the contrary to what has
generally been regarded as the common law, and is certainly
the law with us in Texas.   It is to be observed, however,
that in most of these cases the direct question has not been
presented free from other complications, and its decision
has usually been involved with some question relating to the
burden of proof in criminal cases upon a plea of not guilty.

Were the question an open one, and entirely free from
statutory qualifications, which is not the case, this court
would even then feel some hesitancy in making so radical a
departure from established authorities at common law, and
would feel inclined to follow without much question the

beaten track made by the sages who have illustrated that system of jurisprudence. When examined critically, it occurs to us that there is little practical distinction between the law as contended for and the law as it is. If malice, in all cases, must be an inference of fact to be deduced by the jury, and not in any case an implication of law to be expounded by the court, the inquiry at once arises, from what fact must this inference be deduced? Every inference legitimately arising must have a substratum of fact as a basis, and in the absence of such basis the law permits no inference. Clearly, then, the jury must infer malice from the isolated fact of killing, because we are discussing by way of illustration a case in which nothing else is proven. They cannot draw this inference merely because it fairly and naturally arises from the evidence, because other inferences may likely arise as fairly and as naturally as this. For example, yielding to that most potent presumption of innocence which confronts the prosecution throughout the trial, would it not be a more natural conclusion that the homicide was perpetrated in self-defence, which is justified by all law, — human, natural, or revealed, — rather than that it was induced by a depraved heart, wholly regardless of social duty and fatally bent on mischief? Plainly, this must be so unless the doctrine of natural depravity must obtain in the administration of the law, which happily is not the case. The jury can only indulge this presumption of malice because the law tells them that from the isolated fact of killing, this state of the mind is arbitrarily inferable; which is but an indistinct remove from the principle that from this fact the law implies the malice.

When, in connection with this almost imperceptible shade of distinction, it is remembered that from our earliest decisions down to the last reported, whenever courts of last resort in this State have had occasion to discuss the degrees of murder and the constituent essentials of each, it has been uniformly held, so far as our investigations have extended,

that when the fact of unlawful killing is established, and there are no circumstances in evidence which may tend to establish the existence of express malice, nor which may tend to mitigate, excuse, or justify the act, then the law implies malice, and the offence is murder in the second degree, we cannot hesitate in adhering to the principle, and in avoiding an innovation the exact result of which cannot well be foreseen.

It is useless to inquire by what process of reasoning or from what peculiarity of early law this principle has been derived. Suffice it to say, it is a principle as well established in our system as adjudication can make it; is sanctified by age and repeated decision, and not to be eliminated without grave consideration and by the exercise of the highest powers of government. In almost every case, and especially in the case at bar, it is, as has been said, a harmless abstraction, and " seldom of practical utility in ascertaining the species of malice " (*McCoy* v. *The State*, 25 Texas, 43); and if it must be eliminated from the body of our laws, that duty would more properly devolve upon other departments of government.

The definition of " malice " as given in charge by the court is complained of as not accurate, and as calculated to mislead the minds of the jury, and to confuse them in their application of the law to the facts. A perfectly exact and satisfactory definition of that term, signifying its legal acceptation in a form at once clear and concise, has been often attempted, but with no very satisfactory permanent result. The differing minds of different courts have employed different terms and language in an attempt to convey substantially the same meaning; and while a general similarity is apparent in all the definitions, the legal mind has not yet crystallized the substance of the term into a terse sentence readily comprehendible by the average juror. About as clear, comprehensive, and correct definition as the authorities afford is, that " malice is a condition of the mind

which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken."

The definition contained in the charge, though not exact to a critical nicety, is deemed substantially sufficient to have enabled the jury to distinguish the legal meaning of the term, in contradistinction to its ordinary import. Its error, if error there be, militated against the prosecution and in favor of the defendant, in that it restricted the former to showing that the act was prompted by hatred, ill-will, or hostility toward the party slain, when the term possesses a much more comprehensive meaning. It is hardly legitimate to construe the latter portion of the definition as a distinct and independent enunciation, but it must be construed with what precedes it, and the whole, taken together, must be considered as an explanation by the court of the meaning of the term, amplified more by way of illustration than was perhaps necessary.

Similar remarks may be applied to that portion of the charge defining manslaughter. The statutes are almost literally copied, and the interpolations and emphasis complained of could not have affected the finding. Critical nicety of expression is never absolutely essential in a charge, and substantial accuracy has ever been deemed sufficient to satisfy the demands of the law. Plainly, to our minds, the jury could not have been misled by this portion of the charge, nor could they have mistaken the meaning of the court, which fully assimilated to the meaning of the law as applicable to this particular case.

The quotation from the charge relating to the abstract right of self-defence, found in the brief of counsel and urged as erroneous, when taken and considered with a subsequent omitted portion of the same paragraph, is found to be a full exposition of that branch of the law. The jury are instructed that "a man may defend himself by taking the life of his assailant, if necessary to preserve his own

life, and is justified in so doing ; and he may defend himself, if he is attacked, against serious bodily injury, and when attacked he is not bound to retreat, but may stand and defend himself. The attack upon the person of an individual, in order to justify a homicide, must be such as produces a reasonable expectation or fear of death or some serious bodily injury. A simple assault and battery will not justify a homicide. If the jury find that the defendant killed Olenick in self-defence, under the rule of self-defence as above laid down, the verdict will be not guilty."

Examined in every possible light, we do not understand how this instruction could be tortured into a prohibition against the jury finding a verdict of acquittal only in case the defendant took life in order to preserve his own life, or how it precluded the person assaulted from taking life in order to prevent serious bodily injury to himself. The direction is about as plain as language can make it, that a person may defend himself to the extent of taking life in either contingency, — either to protect himself from being slain or from suffering serious bodily injury at the hands of the party attacking. And when to this is superadded a further instruction, that, " if from the evidence you [the jury] find that the acts and conduct of Olenick, just before the killing, were such as would reasonably produce the belief, and did produce in the mind of the defendant the belief, that Olenick was about to take his life, or inflict on him some serious bodily injury, and you do not find that the altercation was brought on by the defendant for the purpose of affording an opportunity to kill Olenick, and that but for those acts, and the conduct of Olenick at the time of the killing, defendant would not have killed him, then you will find for the defendant," it may be said with safety that, in view of the facts in evidence, the appellant has certainly had the full benefit of every humane principle which a merciful law throws around a prisoner on trial, covering him as with a mantle of protection, and he cannot

complain that all the advanced positions in the law of self-defence were not accorded him.

The court did not err in refusing the instruction asked as to the presumption of law when a fresh provocation intervenes between a preconceived malice against the person killed and the death. We have searched the record in vain to find any evidence whatsoever of fresh provocation, and, if we must indulge any presumption at all, would rather incline to a presumption, in view of the whole evidence, that the fresh provocation, if any in fact existed, came from the defendant.

The verdict is sufficient (*Moore* v. *The State*, 7 Texas Ct. App. 14); and the alleged newly discovered evidence could not have affected the result, or be material on another trial. The appellant has had more than reasonable time in which to make full preparation for his defence, and has been convicted after a fair trial under the forms of law. The record abundantly attests the zeal and ability with which he has been defended, as well as the leniency of his countrymen who sat in judgment upon him; and we fail to perceive that the ends of justice have not been substantially and legally reached in his case.

The judgment is therefore affirmed.

*Affirmed.*